UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TEAMSTERS LOCAL UNION NO. 727 HEALTH AND WELFARE FUND, et al., | ) ) ) |
| Plaintiffs, | ) ) Case No. 19-cv-5839 |
| v. | ) ) Judge Sharon Johnson Coleman |
| THE ILLINOIS STATE TOLL HIGHWAY AUTHORITY, | ) ) ) |
| Defendant. | ) ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Teamsters Local Union No. 727 Health and Welfare Fund ("Health and Welfare Fund") and Local Union No. 727 Legal and Educational Assistance Fund ("Legal and Educational Fund," and collectively, the "Funds") bring this action by and through their Boards of Trustees against the Illinois State Toll Highway Authority (the "Tollway") alleging violations of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(g)(2) and 1145. Currently before the Court is the Tollway's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court grants in part and denies in part the Tollway's motion.

**Background**

The Local 700 State and Municipal Teamsters and Chauffeurs Union, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Union ("Local 700") and the Tollway entered into a collective bargaining agreement (the "Initial CBA"), on April 23, 2015. This agreement covered the time period of October 1, 2014 through February 28, 2018.

In the Initial CBA with Local 700, the Tollway agreed to provide monthly contributions to plaintiff Funds on behalf of each regular, full-time employee within the agreement's purview. The

Initial CBA lists the starting rates of payment, and Sections 11.1(a) and (c) allow the Boards of Trustees to increase the Tollway's contribution rate to the Funds by up to 10% annually between March 1, 2016 and March 1, 2018.

On May 5, 2015, the Tollway executed Participation Agreements with plaintiff Boards of Trustees. The Participation Agreements stated that the Tollway would contribute to the Funds at the rates outlined in the Initial CBA and that the Trustees had the power to interpret the terms of the Participation Agreements. The Participation Agreements would "remain in effect during the term of any collective bargaining agreement between the Tollway and the Union ('Collective Bargaining Agreement'),[1] and during any extensions or renewals thereof" unless one of the parties terminated the Participation Agreements with 180 days' advanced written notice.

On February 28, 2018, the term of the Initial CBA expired. Both parties agreed to extend it. This term of extension is called the "status quo period." The Funds increased their contribution rate on March 1, 2018, the last day of the window in which the Participation Agreements authorized them to do so. The Tollway complied with this increase and continued to make contributions to the Funds at the new 2018 rate during the status quo period. The following year, on March 11, 2019, the Funds sent the Tollway a letter increasing the annual contribution rate by 10% effective March 1, 2019. The Tollway did not increase its payments this time because the proposed increase was outside of the window allowed by the Initial CBA. The Tollway thus continued to pay the 2018 rate.

Meanwhile, throughout the status quo period, the Tollway and Local 700 continued to negotiate the terms of their next collective bargaining agreement (the "New CBA"). On March 14, 2019, the manager of the Funds sent the Tollway a letter (the "March Letter") stating the following:

> It is our understanding that you have reached an agreement with Teamsters Local 700 that will terminate your participation in the Teamsters Local Union No. 727 Health

---

[1] The Court refers to the collective bargaining agreement that covered the time period from October 1, 2014 through February 28, 2018 as the Initial CBA, although the May 2015 Participation Agreements refer to it as the "Collective Bargaining Agreement."

2

> and Welfare Fund and the Teamsters Local Union No. 727 Legal and Educational Assistance Fund ("Funds")[.] The Board of Trustees of the Funds has directed me to inform you that they will be terminating coverage for your employees under our Plans on April 30, 2019.

The Tollway replied that because its Board of Directors had not yet approved the tentative New CBA, the Tollway was still a participating employer in the Funds, and neither the Tollway nor the Trustees could terminate coverage without 180 days' notice. The Trustees reviewed the Participation Agreements and agreed with this assessment. Coverage therefore continued without interruption.

On April 18, 2019, the New CBA took effect. Its term was March 1, 2018 to February 28, 2020. The Tollway argues that the New CBA automatically terminated the Participation Agreements. Plaintiffs disagree. The Tollway made its last payment to the Funds, still at the 2018 rate, in May 2019, then stopped paying entirely. On June 30, 2019, the Tollway began enrolling Local 700 member-employees into its own health insurance plan.

On August 30, 2019, plaintiffs filed the present three-count complaint against the Tollway seeking relief under ERISA. In Count I, plaintiffs seek a court order (a) declaring that the Tollway is bound by the Participation Agreements unless it leaves using the permitted 180-day notice mechanism and (b) requiring the Tollway to cooperate with an audit to determine the full extent of unpaid contributions. In Count II, plaintiffs seek payment for the allegedly inadequate contributions the Tollway made after plaintiffs increased the contribution rate effective March 1, 2019. Last, in Count III, plaintiffs seek payment for all unpaid months of contributions after the Tollway stopped paying entirely. In connection with Counts II and III, plaintiffs seek all delinquent contributions "plus interest, liquidated damages, audit fees and attorneys' fees and costs" pursuant to 29 U.S.C. § 1132(g)(2).

**Legal Standard**

When considering dismissal under Rule 12(b)(6), the Court accepts all well pleaded factual

allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam). To survive, the complaint must "state a claim for relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), which means that it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When ruling on a motion to dismiss, the Court may consider documents attached to the complaint, or even documents not attached to the complaint, if they are central to the plaintiff's claims. *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 809 n.2 (7th Cir. 2018).

**Analysis**

*Durational Relationship Between the Participation Agreements and the Initial CBA*

In unraveling the parties' tangled arguments, the Court first addresses the question of whether the durational language of the Participation Agreements is ambiguous. When resolving ERISA disputes, courts use the federal common law rules of contract interpretation. *Schultz v. Aviall, Inc. Long Term Disability Plan*, 670 F.3d 834, 838 (7th Cir. 2012). Federal common law dictates that the terms of a contract are ambiguous when they are "subject to reasonable alternative interpretations." *Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1018 (7th Cir. 2000) (citation omitted). These interpretations must take the words "in an ordinary and popular sense as would a person of average intelligence and experience." *Id.* (citation omitted). If the terms are unambiguous, they are "not open to any other reasonable interpretations," *id.*, so the Court will "respect the unambiguous meaning" of the terms. *Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Mich., Inc.*, 268 F.R.D. 312, 315 (N.D. Ill. 2010) (Hibbler, J.). However, because the Participation Agreements grant plaintiffs the right to interpret and apply their terms, "the Court will uphold any construction of an ambiguous term . . . that is not 'downright unreasonable.'" *Id.* at 316 (quoting

4

*Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009)). Whether a contract is ambiguous is a matter of law. *Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Mich., Inc.*, 674 F.3d 630, 635 (7th Cir. 2012).

The durational language in Paragraph 1 of the Participation Agreements is unambiguous. The clause states that the Participation Agreements shall "remain in effect during the term of any collective bargaining agreement between the Tollway and the Union ('Collective Bargaining Agreement'), and during any extensions or renewals thereof." Plainly taken, this language means that if there is *any* collective bargaining agreement between the Tollway and Local 700, the Participation Agreements remain in effect. If there is no longer any CBA, or if the parties use the 180-day notice mechanism to terminate, the Participation Agreements end.

Construing the Participation Agreements as a whole reinforces this interpretation. Two paragraphs later, the Participation Agreements refer to "the collective-bargaining agreement in effect between the Tollway and Local 700 beginning October 1, 2014" as the source of contribution rates. If the parties had wanted to refer specifically to the term of the Initial CBA in the durational clause, they could have used this language rather than framing the duration around "any" CBA.

The Tollway argues that the contract is unambiguous and can only be interpreted to refer specifically to the Initial CBA, but this stance is flawed. The Tollway's primary assertion is that the CBA in effect at the time the Participation Agreements were executed was the Initial CBA, and therefore that the phrase and parenthetical "any collective bargaining agreement between the Tollway and the Union ('Collective Bargaining Agreement')" refer specifically to the Initial CBA. This argument contradicts the ordinary sense of the phrase "any collective bargaining agreement," which would appear to an average person to refer not only to the Initial CBA, but to *any* CBA between the parties.

Another argument the Tollway puts forth is that the "extensions and renewals" language

5

would be rendered superfluous if the 180-day notice mechanism were the only means of terminating the Participation Agreements.  Crucially, the notice mechanism is not the only possible means of termination.  The Participation Agreements may also end if there is no CBA of any kind between the Tollway and Local 700.  It is reasonable that the phrase "term of any collective bargaining agreement," without further elaboration, might be interpreted to mean only the original term explicitly set out in such an agreement.  The "extensions and renewals" language that follows is not superfluous; rather, it serves to clarify that extensions and renewals of a CBA after its initial "term" has ended—for example, extensions into status quo periods.  *See FMS, Inc. v. Volvo Const. Equip. N. Am., Inc.*, 557 F.3d 758, 765 (7th Cir. 2009) (language that clarifies ambiguity is not superfluous).

The Tollway also uses the Trustees' behavior in sending the March Letter as evidence that plaintiffs interpreted the Participation Agreements to end when the status quo period of the Initial CBA ended.  Under the federal common law rules of contract interpretation, extrinsic evidence is inappropriate when a contract is unambiguous.  *GCIU Emp'r Ret. Fund v. Chicago Tribune Co.*, 66 F.3d 862, 865 (7th Cir. 1995).  It follows that course of performance evidence is not relevant.

Because the Participation Agreements are unambiguous in terms of their duration, the Court denies the Tollway's motion to dismiss with respect to the declaratory judgment and the unpaid contributions in June and July 2019 and thereafter as alleged in Counts I and III.

*March 1, 2019 Change of Contribution Rate*

The Tollway also argues that plaintiffs fail to state a claim for underpaid contributions in March, April, and May of 2019.  The Court agrees.

The term of the Initial CBA ended on February 28, 2018, after which the parties entered a status quo period.  During this period, the Initial CBA remained in effect while negotiations for the New CBA took place.  *See Auto. Mechanics Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007) (hereinafter *Vanguard*).  The Initial CBA permitted rate

6

increases within the window of March 1, 2016 to March 1, 2018. In addition, the Participation Agreements unambiguously state that the parties should follow the provisions in the Initial CBA. Specifically, the Participation Agreements provide that "[t]he Tollway shall contribute at the rates outlined by the collective-bargaining agreement in effect between the Tollway and Local 700 beginning October 1, 2014 [the Initial CBA], for all of its Unit Employees." The disputed rate increase occurred on March 1, 2019, during the status quo period.

The plain language of the Initial CBA and the Participation Agreements authorizes rate increases only within the window set forth in the Initial CBA. While plaintiffs assert their right to interpret the terms of the Participation Agreements, those terms unambiguously state that the Initial CBA is controlling—and plaintiffs do not have the right to interpret the terms of the Initial CBA, especially because they were not parties to that agreement. The Initial CBA's terms regarding rate changes, found in Sections 11.1(a) and (c), are unambiguous. As a result, plaintiffs fail to state a claim with respect to the March 1, 2019 rate increase.

Plaintiffs argue that portions of the Participation Agreements grant them certain powers that permit them to increase contribution rates during the status quo period. For example, the Tollway is "bound by the terms and conditions of the Fund's rules and regulations" and bound by actions the Board of Trustees takes "pursuant to the powers granted them by the Restated Agreement and Declaration of Trust." Nonetheless, plaintiffs' authority to set contribution rates as described in the Participation Agreement is explicitly tied to the provisions in the Initial CBA, and the Initial CBA does not permit rate increases after March 1, 2018. The powers plaintiffs rely upon do not change that.

Moreover, neither of the cases provided by the parties is precisely on point regarding rate increases during the status quo period. In *Vanguard*, the question was whether the Funds could increase the contribution rate during the status quo period when the participation agreement stated

7

that "[t]he rate at which contributions are to be made during any renewed term shall be that set by the Board of Trustees." *Vanguard*, 502 F.3d at 748. The Seventh Circuit thus concluded that the status quo period did not qualify as a renewed term, so the rate increase during the status quo was invalid. The other case, *Dodge of Naperville*, involved participation agreements with "nearly identical terms" to those in *Vanguard*, but the district court found that a rate increase during the status quo period was appropriate. *Trs. of Auto. Mechs. Indus. Welfare & Pension Funds, AFL-CIO, Local 710 v. Dodge of Naperville*, 220 F. Supp. 3d 899, 909 (N.D. Ill. 2016) (Norgle, J.).

Factual distinctions led to the different outcomes in *Dodge of Naperville* and *Vanguard*, and the matter at hand is more closely analogous to *Vanguard*. First, in *Dodge of Naperville*, "[t]he Trustees were complying with Congressional mandates when they changed the contribution rates," whereas in *Vanguard* the change was "unilateral and voluntary." Second, in *Dodge of Naperville* the employer did not make any payments whatsoever, while in *Vanguard* the employer continued to pay at the previous rate during the status quo period and simply declined to adopt the increase. In the case of the Tollway and plaintiffs here, the Trustees' rate change was "unilateral and voluntary," and the Tollway continued to make payments at the 2018 rate until after the status quo period ended. While the comparison is not perfect, *Vanguard* is the closest controlling case. The Court therefore grants the Tollway's motion to dismiss Count II.

**Conclusion**

For the foregoing reasons, the Court denies the Tollway's motion to dismiss with respect to Counts I and III. The Court grants Tollway's motion with respect to Count II and dismisses Count II with prejudice. [17].

**IT IS SO ORDERED.**

Date: 5/11/2020              Entered: _____

                             SHARON JOHNSON COLEMAN
                             United States District Judge

8